———————————————————————————————

JULIA BALTA and MARJORIE BALTA,

|  |  |
|---|---|
| | AMENDED |
| Plaintiff | DECISION AND ORDER |
| -vs- | |
| | 04-CV-6164 CJS |
| THE AYCO COMPANY, LP, a Delaware Partnership, | |
| Defendant | |

———————————————————————————————

JAMES BALTA,

|  |  |
|---|---|
| Plaintiff | |
| -vs- | 04-CV-6165 CJS |
| THE AYCO COMPANY, LP, a Delaware Partnership, | |
| Defendant | |

———————————————————————————————

APPEARANCES

| | |
|---|---|
| For plaintiffs Julia Balta and Marjorie Balta: | K. Wade Eaton, Esq.<br>Chamberlain D'Amanda Oppenheimer & Greenfield, LLP<br>1600 Crossroads Building<br>Rochester, New York 14614 |
| For plaintiff James Balta: | Mitchell T. Williams, Esq.<br>Williams & Williams<br>28 E. Main Street, Suite 600<br>Rochester, New York  14614 |
| For defendant The Ayco Company, LP: | Thomas E. Reidy, Esq.<br>Michael D. Norris, Esq.<br>Amy Levine Fici, Esq.<br>Ward, Norris, Heller & Reidy, LLP<br>300 State Street, 6th Floor<br>Rochester, New York 14614 |

INTRODUCTION

Plaintiffs in this diversity action are suing their former financial advisors for money damages that they sustained following a series losses in the stock market. Now before the Court is Ayco Company, LP's motion for partial summary judgment [#54].[1] For the reasons that follow, the application is granted in part and denied in part.

BACKGROUND

Unless otherwise indicated, for purposes of ruling on the instant application only, the following are the facts of the case viewed in the light most-favorable to Plaintiffs. At all relevant times, plaintiff Marjorie Balta ("Mrs. Balta") and her two adult children, James Balta ("James") and Julia Balta ("Julia"), resided together in Pittsford, New York. At all relevant times, defendant The Ayco Company, LP ("Defendant") provided investment advisory services. Jeffrey Konya ("Konya") was employed as a staff attorney by Defendant during the period November 1998 through November 5, 1999.

In the Summer of 1998, the Balta's collectively owned over $4 million in assets that were invested with the offices of Salomon Smith Barney ("SSB").[2] The investments consisted mainly of "highly appreciated" stock in Paychex, Inc. Each of the Baltas had an investment account, and Mrs. Balta also had an IRA account, making a total of four accounts at SSB. Mrs. Balta and Julia authorized James to handle their investments, making him the "de facto trustee" of their assets. James's role as de facto trustee included the responsibility of relaying investment advice, that he received from paid advisors, to his

---

[1] The Court previously addressed one aspect of Ayco's motion, and granted summary judgment to Ayco on Plaintiffs' claims for punitive damages. (Docket No. [#76]).

[2] Prior to May 1999, the investments were with SSB's office in Rochester, New York. In May 1999, James moved the accounts to SSB's New York City office.

mother and sister. (James's Deposition at 316).

James and Konya were friends and former high-school classmates. In the Fall of 1998, Konya notified James that he had become employed at Defendant, and that Defendant could provide the Baltas with investment advice, estate planning and other financial matters. Konya was employed at Defendant as a staff attorney, and not as an investment advisor. Konya put James in contact with Tom McMahon ("McMahon"), an investment advisor employed by Defendant. In late 1998, McMahon spoke with James by telephone, and described Defendant's services. Subsequently, in January 1999, James met with Konya and McMahon at Defendant's offices near Albany, New York, to further discuss Defendant's services. Subsequently, James provided McMahon with various information concerning Plaintiffs' financial condition and goals.[3] On June 21, 1999, McMahon wrote to James, indicating that Defendant "would be pleased" to provide Plaintiffs with "a financial counseling arrangement," involving estate planning, investment advice, and income tax services, and that the fee for such an arrangement would be $9,000 for the first year. McMahon's letter further stated, in relevant part: "If you decide to go forward with our service, please give me a call and we can formally present you with a contract." At his deposition, when asked how he understood this statement by McMahon, James stated: "I believe he wanted something in writing." (James Deposition at 119).

On or about June 25, 1999, in response to McMahon's letter, James telephoned

---

[3]For example, in April 1999, McMahon sent "data book" questionnaires to the Baltas, which they each completed and returned. In that regard, Mrs. Balta indicated that she wanted her portolio invested 10% in high risk investments, 50% in moderate risk investments, and 40% in low-risk investments, while Julia indicated that she wanted her portfolio invested 10% in high risk investments, 70% in moderate risk investments, and 20% in low-risk investments.

McMahon and indicated that the $9,000 fee was acceptable, and that Plaintiffs wanted to use Defendant's services. Subsequently, on or about June 28, 1999, McMahon sent James a written agreement, which stated, in relevant part:

Dear Jim:

The Ayco Company, L.P. is pleased to provide personal financial counseling for you. We ask that you sign and return the enclosed copy of this letter to denote your acceptance of the terms and provisions provided herein.
Our annual fee for personal financial counseling services rendered shall be $9,000. This fee will be billed 50% upon engagement and the remaining 50% six months later. Upon renewal of this arrangement, the fee shall be paid semiannually in advance. Travel costs, including transportation, living expenses and specific disbursements, will be charged as applicable and billed on a quarterly basis.

The term of this arrangement shall be one year. This arrangement shall renew annually for subsequent periods of one year each. You will be advised of your fee for subsequent year's services in advance. You may terminate this arrangement at any time by providing written notice to The Ayco Company, L.P. This termination will be considered effective immediately upon receipt of your notice. All fees billed shall be prorated to the date of our receipt of your termination notice, and we shall refund to you the proportional part of any fees already paid, but unearned.

The above fee does include any charges for preparation of annual income tax returns. The Securities and Exchange Commission requires The Ayco Company, L.P., as a registered investment advisor, to provide you with the enclosed copy of our Form ADV-Part II which contains information relating to the Ayco Company, L.P.'s advisory services.[4] You shall have the right to

---

[4]The Form ADV-Part II disclosure was required by 17 C.F.R. § 275.204-3, which provides, in relevant part:

 (a) General requirement. Unless otherwise provided in this rule, an investment adviser, registered or required to be registered pursuant to Section 203 of the Act shall, in accordance with the provisions of this section, furnish each advisory client and prospective advisory client with a written disclosure statement which may be either a copy of Part II of its form ADV which complies with § 275.204-1(b) under the Act or a written document containing at least the information then so required by Part II of Form ADV.

(b) Delivery. (1) An investment adviser, except as provided in paragraph (2), shall deliver the statement required by this section to an advisory client or prospective advisory client (i) not less than 48 hours prior to entering into any written or oral investment advisory

terminate this agreement, without penalty, for a period of five days after your first receipt of Ayco's Form ADV-Part II.

As a registered investment adviser, The Ayco Company, L.P. receives fees for financial counseling services. In the course of providing such services, The Ayco Company, L.P. or its subsidiaries or affiliates may offer additional services and/or products for which additional fees or commissions are charged. These offerings create a conflict of interest, within The Ayco Company, L.P., between our business interests and our fiduciary responsibility to our clients.

The Ayco Company, L.P. places great emphasis on the integrity of its fiduciary responsibility to clients. Clients will be advised by letter whenever fees or commissions paid to The Ayco Company, L.P. or its affiliates for supplemental products or services constitute a conflict of interests. Clients will be asked to approve payment with full understanding of the specific conflict disclosed in the letter.

This agreement may not be assigned, in whole or in part, without prior consent of the other party. This agreement may be modified only in writing, signed by both parties hereto. The Ayco Company, L.P. will notify you of any change in its general partner and, to the extent required by applicable law, of any changes in its limited partners, in each case within a reasonable time after such change.

If you have any questions, please feel free to contact me. Once again, on behalf of The Ayco Company, L.P., we are very pleased that you have selected our services.

(Reidy Declaration Exhibit R). The letter agreement was signed by McMahon, and provided a line for James to sign, indicating that he "accepted." (*Id*.). James signed the agreement and returned it to Defendant, along with a check in the amount of nine thousand dollars. Although James did not sign the agreement and disclosure forms until some time after July 28, 1999, Defendant subsequently billed the Baltas for "tax and investment

---

contract with such client or prospective client, or (ii) at the time of entering into any such contract, if the advisory client has a right to terminate the contract without penalty within five business days after entering into the contract.

counseling and advice . . . for the period July 1, 1999 through December 31, 1999." (Eaton Declaration, Exhibit 13).

At McMahon's request, James had copies of his monthly account statements and trade confirmation slips from Plaintiffs' SSB investment accounts sent to McMahon. (McMahon Dep. at 153, 201). Sometimes McMahon reviewed the statements when they were received, but generally he used them to prepare for his quarterly meetings with James. *Id*. at 155, 201-202.

Although Konya was not an investment advisor, he nevertheless made various investment recommendations to James. In that regard, Konya urged James to sell Plaintiffs' Paychex stock, purportedly because it was too risky, and recommended that James instead buy Philip Morris stock. James took Konya's advice, and in July 1999, he sold approximately $1.2 million of Paychex stock from Julia's and his accounts, and used the proceeds to purchase Philip Morris stock. McMahon did not advise James to take such action, nor did he learn about the trade until some time later. However, according to James, when he told McMahon about the trade and Konya's advice, McMahon responded by saying "Fine." (James Balta Deposition at 178). According to James, Konya continued to pressure him to sell the rest of the Paychex stock, which he did. However, Konya subsequently changed his mind about Philip Morris, and urged James to buy AT&T stock instead. Based on Konya's recommendation, between July 21, 1999 and October 5, 1999, James sold the rest of Plaintiffs' stock in Paychex, Inc., and, between August 1999 and September 1999, purchased 35,000 shares of AT&T stock for Plaintiffs' accounts. Konya advised James that buying large amounts of Philip Morris and AT&T would ensure proper diversification of his portfolio, since those companies themselves owned many other

6

companies in various sectors of the economy.

At Konya's suggestion, in August 1999, James also purchased 1,400 shares of Worldcom stock for Plaintiffs' accounts. James maintains that, at some point, he discussed Worldcom's stock with McMahon, and that McMahon responded that Worldcom "was a good stock," and that Defendant was "very bullish on Worldcom, that they liked the fundamentals of the stock." (James' Deposition at 254; *see also Id*. at 310). On March 21, 2000, McMahon noted, in a memo to Plaintiffs' file, that James "indicated that he still likes MCI Worldcom and will add to his position if he has additional cash or liquidates other positions." (Williams Declaration, Exhibit BB).

Konya left his employment at Defendant in November 1999. Subsequently, James sold Plaintiffs' Philip Morris stock at a loss, and continued to buy stock in AT&T. James also bought 13,555 additional shares of Worldcom stock . Konya did not continue to advise James after he left Defendant's employ. Nevertheless, James continued to buy stocks based, at least in part, on the advice that Konya had given him while Konya was employed by Defendant. (James's Deposition at 350-353).

In December 1999, McMahon and James spoke by telephone, and discussed James's recent trades. On January 6, 2000, McMahon wrote a letter to James, expressing his concern over the amount of AT&T stock in Plaintiffs' portfolios. In relevant part, McMahon stated:

> There are also some other issues which I want to cover with you regarding our last telephone conversation:
> ***
> I reviewed with you a summary of the positions held in your and Julia's Salomon Smith Barney accounts. As of the time of our conversation, you still held a position in Philip Morris Company. However, during our conversation, you indicated that you liquidated your and Julia's entire positions in Philip

> Morris Company and established additional positions with AT&T Corp. Jim, I want to stress that these purchases and sales have not been recommended by me and that you have been working with John Sorensen at Salomon Smith Barney in this regard.
>
> ***
>
> Your initial goal was to liquidate your position in Paychex and invest the net after-tax proceeds in a diversified investment portfolio. However, what you have done is gone from a situation where your entire portfolio was invested in Paychex stock to a portfolio that was mainly invested in Philip Morris stock and now to a portfolio that is overweighted in AT&T stock. Initially, when you purchased Philip Morris stock, you indicated that this would be a long-term hold and that you are [sic] purchasing it for the high dividend yield in [sic] long-term growth potential. However, several months later, the entire position was liquidated at a substantial loss. This strategy and your large position in AT&T concern me.

(Reidy Declaration Exhibit AA). Despite McMahon's warning, on February 11, 2000, James purchased an additional 1000 shares of AT&T for Mrs. Balta's IRA account.

On March 22, 2000, McMahon sent James another letter, in which he again expressed concern over Plaintiffs' large holding of AT&T stock. In relevant part, McMahon wrote: "Currently you have approximately 90% of your investable funds invested in AT&T Corporation. Although, you are very bullish on AT&T and its tracking stock and eventual IPO, I still believe you are much too overweighted in AT&T and should consider further diversification." (Reidy Declaration Exhibit CC). Nevertheless, James subsequently purchased an additional 7,800 shares of AT&T stock for Plaintiffs' portfolios.

The AT&T and Worldcom stocks subsequently dropped in value, which, along with substantial capital gains tax liability generated by the sale of the Paychex stock, resulted in losses to Plaintiffs exceeding $2 million. In November 2000, Plaintiffs terminated their association with Defendant.

On April 12, 2004, Plaintiffs commenced the subject actions.[5]  Pursuant to stipulated Order [#15], the two cases are now consolidated.  All three Plaintiffs are asserting claims against Defendant for breach of contract, breach of fiduciary duty, and constructive fraud, under New York law.  Additionally, Mrs. Balta and Julia are asserting a claim against Defendant for aiding and abetting James's breach of fiduciary duty to them.  Plaintiffs demand money damages associated with a loss in value of the various stocks, and damages associated with capital gains taxes levied following the sale of the Paychex stock.

 With regard to the breach of contract claims, Plaintiffs allege that, on or about June 21[6], 1999, they entered into a contract with Defendant, pursuant to which Defendant was to provide "various financial services, including investment advice."  Plaintiffs allege that Defendant breached the agreement by allowing Konya to give bad investment advice to James, and by otherwise failing to provide sound investment advice.

With regard to the breach of fiduciary duty claims, Plaintiffs allege that a fiduciary relationship existed between them and Defendant, and that Defendant breach its fiduciary duties by: failing to advise them that Konya was not qualified to give investment advice; failing to advise them that Konya was giving bad advice; and by failing "to employ such care, skill and caution in rendering investment advice as would customarily be exercised by a prudent investment advisor of discretion and intelligence having special investment skills."

With regard to the constructive fraud claims, Plaintiffs allege that "[a]s a fiduciary,

---

[5]Plaintiffs are citizens of the State of Virginia.  Defendant is a Delaware corporation with its primary place of business in the State of New York.  Subject matter in this case is based upon diversity jurisdiction pursuant to 28 U.S.C. § 1332.

[6]James alleges that he entered into an oral contract with Defendant on or about June 25, 1999.

Defendant was under a duty" to advise Plaintiffs that Konya was giving them bad investment advice. Plaintiffs maintain that Defendant's failure to disclose that information resulted in "substantial financial losses."

Finally, with regard to Mrs. Balta's and Julia's claim for aiding and abetting a breach of fiduciary duty, they allege that James was their de facto trustee and fiduciary, and that he breached his fiduciary duties by "investing improperly in large concentrated holdings of three stocks: Philip Morris, AT&T and Worldcom." Mrs. Balta and Julia further allege that Defendant induced James's breach, and also aided and abetted the breach, by failing to notify them that James was investing their assets improperly.

Following the completion of discovery, Defendants filed the subject motions, for partial summary judgment and for dismissal. Defendants make several arguments in support of their motions. At the outset, Defendants contend that Plaintiffs' claims for breach of fiduciary duty, and their claims for aiding and abetting such breach, are barred by a three-year statute of limitations. Additionally, Defendants maintain that the claims for constructive fraud should be dismissed as merely incidental to the breach of fiduciary duty claims, and that they are time-barred in any event. Defendants further argue that James Balta's breach of fiduciary duty and constructive fraud claims are duplicative of his breach of contract claim, and should be dismissed. Defendants next argue that Plaintiffs cannot establish causation with regard to their claims involving losses attributable to the AT&T and Worldcom stock, since McMahon never advised James to buy the stock, and instead, warned James to diversify at a time when he could have avoided the loss in value. Defendants also contend that, to the extent that Plaintiffs claim that an oral contract was formed prior to the execution of the written agreement, no such oral agreement existed.

In response, Plaintiffs maintain, *inter alia*, that the breach of fiduciary duty claims, aiding and abetting claims, and constructive fraud claims, are all subject to a six-year statute of limitations. Plaintiffs also state that the breach of fiduciary duty claims and constructive fraud claims are actionable independently of the breach of contract claims, and that the breach of fiduciary duty claims and constructive fraud claims are not duplicative. Plaintiff's further maintain that Defendant proximately caused the losses involving the AT&T and Worldcom stock, by failing to advise them to diversify. In that regard, Plaintiffs have submitted an affidavit from an expert witness, Charles Porten, CFA ("Porten"), which indicates, *inter alia*, that Defendant failed to properly advise Plaintiffs regarding the concentration of AT&T stock, and failed to properly supervise or restrain Konya concerning his recommendations to buy ATT&T and Worldcom stock. (Williams Declaration, Exhibit EE at pp. 4-6). Plaintiffs also contend that there are triable issues of fact as to whether an oral contract was formed prior to the execution of the written agreement.

## ANALYSIS

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 Moore's Federal Practice, § 56.11[1][a] (Matthew Bender 3d ed.). "In moving for

summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996)(*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)), *cert denied*, 517 U.S. 1190 (1996).  Once that burden has been established, the burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e);  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  To carry this burden, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249.  To carry their respective burdens, the parties must point to evidentiary proof in admissible form. FED. R. CIV. P. 56(e).  The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).  Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).

### Statute of Limitations for Breach of Fiduciary Duty and Constructive Fraud

Defendants contend that Plaintiffs' breach of fiduciary duty claims are governed by a three-year statute of limitations, while Plaintiffs' maintain that the applicable period is six years.  The law of the State of New York in this regard appears clear:

> New York law does not provide any single limitations period for breach of fiduciary duty claims. Generally, the applicable statute of limitations for breach of fiduciary claims depends upon the substantive remedy sought. Where the relief sought is equitable in nature, the six-year limitations period

12

of CPLR 213(1) applies. On the other hand, where suits alleging a breach of fiduciary duty seek only money damages, courts have viewed such actions as alleging "injury to property," to which a three-year statute of limitations applies.

*Kaufman v. Cohen*, 307 A.D.2d 113, 118, 760 N.Y.S.2d 157, 164 (1ˢᵗ Dept. 2003) (citations omitted); *see also, Carlingford Ctr. Point Assocs. V. MR Realty Assocs.,L.P.*, 4 A.D.3d 179, 179-180, 772 N.Y.S.2d 273, 274 (1ˢᵗ Dept. 2004) ("A breach of fiduciary duty claim is governed by either a three-year or six-year limitation period, depending on the nature of the relief sought. The shorter time period applies where monetary relief is sought, the longer where the relief sought is equitable in nature.") (citations omitted).

However, an exception to this general rule is that claims for breach of fiduciary duty that sound in fraud are subject to a six-year statute of limitations, even when the relief sought is money damages. *Kaufman v. Cohen*, 760 N.Y.S.2d at 164 ("[T]he case law in New York clearly holds that a cause of action for breach of fiduciary duty based on allegations of actual fraud is subject to a six-year limitations period.") (citations omitted); *Klein v. Gutman*, 12 A.D.3d 417, 419, 784 N.Y.S.2d 581, 584 (2d Dept. 2004) ("[A] cause of action alleging breach of fiduciary . . . based on allegations of actual fraud . . . is subject to a six-year limitations period.") (citations omitted); *Williams v. Sidley Austin Brown & Wood, L.L.P.*, 15 Misc.3d 1125(A), 841 N.Y.S.2d 222, 2007 WL 1203594 at *5 (N.Y. Sup. Ct. Apr. 24, 2007) ("The applicable statute of limitations for aiding and abetting a breach of fiduciary duty depends on [the] substantive remedy being sought, and where, as in this case, the underlying breach is predicated on fraud, which is intrinsic and not incidental to the primary causes of action, the statute of limitations is six years, notwithstanding the fact that plaintiffs seek solely monetary relief.") (citations omitted); *Escava v. Escava*, 9 Misc.3d

1101(A), 2005 WL 2077221 at *17 (Sup. Ct. Kings County Aug. 25, 2005) ("A cause of action premised upon a breach of fiduciary duty claim is governed by a three-year Statute of Limitations where . . . monetary relief and not equitable relief is sought.  To the extent that the breach of fiduciary duty claim sounds in fraud it is subject to the six year . . . statute of limitations.") (citations omitted); *In re Bennett Funding Group, Inc.*, 367 B.R. 302, 316 (N.D.N.Y. 2007) ("[T]he Statute of Limitations for Breach of Fiduciary Duty sounding in fraud is six years pursuant to New York Civil Practice Law and Rules ("NYCPLR") § 213(8)").

The Statute of Limitations for claims of constructive fraud is also six years. *Orr v. Kinderhill Corp.*, 991 F.2d 31, 35 (2d Cir. 1993) ("[A]ctions for constructive - rather than actual- fraud have long been subject to the catch-all limitations period of CPLR § 213(1)," which is six years.) (Citations omitted).  Accordingly, breach of fiduciary duty claims that are based on constructive fraud must be commenced within six-years. *See, Old Republic Ins. Co. v. Hansa World Cargo Serv., Inc.*, 51 F.Supp.2d 457, 468-469 (S.D.N.Y.1999) (Six-year statute of limitations applies to breach of fiduciary duty claim based upon constructive fraud).

> At the same time, though, it is also well settled that
>
> courts will not apply the fraud statute of limitations if the fraud allegation is only incidental to the claim asserted; otherwise, fraud would be used as a means to litigate stale claims.  Thus, where an allegation of fraud is not essential to the cause of action pleaded except as an answer to an anticipated defense of the Statute of Limitations, courts look for the reality, and the essence of the action and not its mere name.

*Kaufman v. Cohen*, 760 N.Y.S.2d at 165 (citations and internal quotation marks omitted).

Courts applying this rule have dismissed fraud claims that are merely incidental to stale

breach of fiduciary duty claims. *See, Buller v. Giorno*, 57 A.D.3d 216, 868 N.Y.S.2d 639, 640 (1st Dept. 2008) ("[T]he allegations of fraud are incidental to those of breach of fiduciary duty.") (citations omitted); *Rand Int'l Leisure Prods., Inc. v. Bruno*, 22 Misc.3d 1111(A), Slip Copy, 2009 WL 130136 at *5 (N.Y. Sup. Ct. Nassau County, Jan. 14, 2009) ("[The] fraud allegations are incidental, rather than integral, to the underlying breach of fiduciary duty claim. Thus, a three year limitations period is applicable.").

In the instant case, as discussed above, Plaintiffs' breach of fiduciary duty claims have two aspects: 1) those claims based on a failure to disclose information; and 2) those claims based on a failure "to employ such care, skill and caution in rendering investment advice as would customarily be exercised by a prudent investment advisor of discretion and intelligence having special investment skills." The latter claims seek money damages, and are not based on fraud. Accordingly, the breach of fiduciary duty claims that are based on Defendant's alleged failure "to employ such care, skill and caution in rendering investment advice as would customarily be exercised by a prudent investment advisor of discretion and intelligence having special investment skills," are subject to a three-year statute of limitations.[7] Since this action was not brought within three years of the breach,

_____

[7]Plaintiffs contend that these claims are nevertheless subject to a six-year limitations period, because they arise from a contract. On that point, Plaintiffs cite, *inter alia*, *Mejia-Ricart v. Bear Stearns & Co.*, No. 95 CIV. 582 (LLS), 1996 WL 94810 at *3 (S.D.N.Y. Mar. 4, 1996). The *Mejia-Ricart* decision observed that some courts had applied a six-year statute of limitations to a breach of fiduciary claim, when the claim "ha[d] its genesis in the parties' contractual relationship," and that such "approach is based on the rule that a claim against a professional for failure to exercise due care in the performance of a contract for professional services is governed by the six-year contract statute of limitations." *Id*. (*citing, inter alia, Sears, Roebuck & Co. v. Enco Assocs.*, 43 N.Y.2d 389, 401 N.Y.S.2d 767 (1977)). However, Plaintiffs' breach of fiduciary duty claims do not purport to arise from the parties' contractual relationship. Instead, the breach of fiduciary duty claims are pleaded as separate causes of action from the breach of contract claims, and do not mention a contract. (*See*, Mrs. Balta's & Julia's Complaint ¶ ¶ 102-112; James's Complaint ¶ ¶ 86-97). Additionally, James states that his breach of fiduciary duty claim is independent of his breach of contract claim. (Williams Declaration [#45] at 9-10). Accordingly, the breach of fiduciary duty claims are not subject to the six-year statute of limitations for breaches of fiduciary duty arising from

those claims are time-barred.

By contrast, Plaintiff's breach of fiduciary duty claims alleging a failure to disclose information sound in constructive fraud.[8]  Moreover, the constructive fraud allegations are not merely incidental to the breach of fiduciary duty claims, but instead, state valid claims for constructive fraud.  *See, Kaufman v. Cohen*, 760 N.Y.S.2d at 165 ("In our view, [plaintiff's] allegations are not merely incidental to the breach of fiduciary duty claim, and, instead, state a valid cause of action for actual fraud.") (citations omitted).  Accordingly, the breach of fiduciary duty claims that are based on a failure to disclose information (i.e. constructive fraud) are subject to a six-year limitations period, even though they demand money damages.  Since this action was commenced within six years of the alleged breach, the fiduciary duty claims based on constructive fraud, as well as the essentially-identical

---

contracts discussed in the *Mejia-Ricart* and *Enco Assocs.* cases. *See, Kaszirer v. Kaszirer*, 286 A.D.2d 598, 598-599, 730 N.Y.S.2d 87, 88 (1st Dept. 2001) ("Here, the sixth cause of action alleges that defendant former trustee knew or should have known of his co-trustee's alleged conversion of trust assets and was negligent in not apprising plaintiffs thereof, and does not allege fraud or *breach of any particular provision of the trust agreement*. Thus, the sixth cause of action was properly held to be subject to a three-year, not a six-year, limitations period.") (emphasis added); *see also, Malmsteen v. Berdon, LLP*, 477 F.Supp.2d 655, 667 (S.D.N.Y. 2007) (citing the *Kaszirer* decision for the proposition that "where breach of fiduciary duty cause of action does not allege fraud or *breach of any particular contractual provision*, it is properly held to be subject to a three-year, not a six-year, limitations period.") (emphasis added; internal quotation marks omitted).  Moreover, in 1996 the New York State Legislature reduced the six-year period referred to in *Mejia-Ricart* to three years. *See, Brzozowski v. Zio Italian Bistro*, 178 Misc.2d 761, 763, 680 N.Y.S.2d 806, 807 (N.Y.Sup. Ct. 1998) ("Effective September 4, 1996 (L.1996, ch. 623), CPLR 214(6) provides that all causes of action for malpractice other than medical, dental or podiatric malpractice must be commenced within three years 'regardless of whether the underlying theory is based in contract or tort.' This amendment overruled the holdings of the Court of Appeals in *Santulli v. Englert, Reilly & McHugh, P.C.*, 78 N.Y.2d 700, 579 N.Y.S.2d 324, 586 N.E.2d 1014 (1992), and *Sears, Roebuck & Co. v. Enco Assocs.*, 43 N.Y.2d 389, 401 N.Y.S.2d 767, 372 N.E.2d 555 (1977), which allowed a six-year limitations period in malpractice actions under a contract theory."); *accord, Ruffolo v. Garbarini & Scher, P.C.*, 239 A.D.2d 8, 11, 668 N.Y.S.2d 169, 170 (1[st] Dept. 1998).

[8] *Allen v. Westpoint-Pepperell, Inc.*, 11 F.Supp.2d 277, 283-284 (S.D.N.Y. 1997) ("To establish a claim for constructive fraud, plaintiffs must show (1) a confidential or fiduciary relationship exists, or alternatively that one party has superior knowledge not available to the other; (2) a representation of fact which is false; (3) justifiable reliance on such false representation; and (4) detriment as a result of such reliance.") (footnote and citations omitted).

claims for constructive fraud[9], are timely.

_Statute of Limitations for Aiding and Abetting Breach of Fiduciary Duty_

Mrs. Balta and Julia assert that James breached his fiduciary duties to them, and that Defendant aided and abetted that breach. "In stating a claim for aiding and abetting a breach of fiduciary duties, the [plaintiff] must show: (1) the existence of a violation of fiduciary duty by the primary . . . ; (2) knowledge of this violation on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in the achievement of the primary violation." _Meridien Int'l Bank Ltd. v. Government of the Republic of Liberia_, 23 F.Supp.2d 439, 452, n. 9 (S.D.N.Y. 1998) (citations and internal quotation marks omitted). Mrs. Balta and Julia maintain, _inter alia_, that James breached his duty "to invest [their] assets as would a prudent investor taking into account [their] financial circumstances and investment objectives," and that Defendant "induced and participated in [James's] breach . . . through Konya's improper investment advice concerning Philip Morris, AT&T and Worldcom stock." Mrs. Balta and Julia also allege that James failed to relay specific investment advice, and that Defendant aided and abetted such breach by failing to notify them that James was investing their assets improperly. Specifically, they allege: "Ayco also participated in, aided and abetted [James's] breach of his fiduciary duties by failing to advise the plaintiffs, to whom Defendant owed fiduciary allegiance, that [James] was

---

[9] Mrs. Balta and Julia maintain that their breach of fiduciary duty claims and constructive fraud claims are not identical, since a constructive fraud claim does not require the existence of a fiduciary relationship, and may arise where one party has superior knowledge. It is true that a duty to disclose information may arise where one party to a transaction has superior knowledge that is not readily available to the other party. _See_, _Creative Waste Management, Inc. v. Capitol Envtl . Servs., Inc._, 429 F.Supp.2d 582, 607 (S.D.N.Y. 2006). However, that fact is irrelevant here, since Plaintiffs' constructive fraud claims are expressly based on the existence of a fiduciary relationship. _See_, Mrs. Balta's and Julia's Complaint ¶ 115; James's Complaint ¶ 100.

17

investing their assets improperly." (Mrs. Balta's and Julia's Complaint at ¶ 127). To summarize, similar to Plaintiffs' breach of fiduciary duty claims against Defendant, the aiding and abetting claim alleges that James committed the primary, underlying breach in two ways: 1) he failed to invest prudently; and 2) he failed to disclose information. Mrs. Balta and Julia further maintain that Defendant aided and abetted both of those breaches.

The statute of limitations for a claim of aiding and abetting a breach of fiduciary duty is the same limitations period that would apply to the underlying breach. *See, Williams v. Sidley Austin Brown & Wood, L.L.P.*, 2007 WL 1203594 at *5. Based on the applicable legal principles discussed earlier, the statute of limitations for Defendant's alleged aiding and abetting of James's imprudent investing is three years.[10] Accordingly, that aspect of the aiding and abetting claim is time-barred. By contrast, the statute of limitations for

---

[10]A claim for aiding and abetting a breach of fiduciary duty that seeks only money damages, and which is not based on fraud, is generally subject to a three-year limitations period. *See, Fezzani v. Bear, Stearns & Co., Inc.*, No. 99 Civ. 0793(RCC), 2004 WL 1781148 at *3 (S.D.N.Y. Aug. 10, 2004). While agreeing with this general principle (*See*, Plaintiffs' Memo of Law at 9), Plaintiffs argue, nevertheless, that a six-year limitations period applies, since the remedy for a breach of fiduciary duty involving a trustee's failure to prudently invest assets is necessarily equitable in nature, even where money damages are sought. (*Id*. at 10) ("The long recognized remedy for breach of a fiduciary's duty to prudently invest assets held in trust is equitable in nature."). In other words, Plaintiffs maintain that claims for breach of fiduciary duty and/or aiding and abetting breach of fiduciary duty involving the imprudent investment of assets are always subject to a six-year limitations period. (*Id*.). In support of this argument, Plaintiffs cite two cases, *Magill v. Dutchess Bank and Trust Co.*, 150 A.D.2d 531, 532 (2d Dept. 1989) and *Williams v. J.P. Morgan & Co., Inc.*, 199 F.Supp.2d 189 (S.D.N.Y. 2002), as well as a concurring opinion by Judge Newman in *Pereira v. Farace*, 413 F.3d 330, 345 (2d Cir. 2005). As the *Magil* decision, and Judge Newman's concurring opinion in *Pereira*, indicate, claims for breach of fiduciary duty against a trustee have been considered equitable in nature. However, as the majority in *Pereira* recognized, in light of recent Supreme Court precedent, "for restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property *in the defendant's possession*." *Pereira v. Farace*, 413 F.3d at 340 (emphasis in original) (*quoting Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 214, 122 S.Ct. 708 (2002)). By contrast, where a defendant "never possessed the funds in question and thus [was] not unjustly enriched, the remedy sought against [it] cannot be considered equitable." *Id*. at 339. In the instant case, Plaintiffs are seeking money damages, as opposed to the recovery of specific funds, inasmuch as Defendant never had possession of Plaintiffs' assets. Consequently, the Court finds that the three-year statute of limitations applies. *See, Fezzani v. Bear, Stearns & Co., Inc.*, 2004 WL 1781148 at *3.

18

Defendant's alleged aiding and abetting of James's fiduciary breach involving a failure to disclose information (i.e. constructive fraud) is six years. Therefore, the aiding and abetting claim is timely insofar as it is based on an underlying fiduciary breach by James involving constructive fraud.

<u>*Although Timely, The Breach of Fiduciary Duty Claims and Constructive Fraud*
*Claims Are Duplicative of the Breach of Contract Claims*</u>

Defendant alternatively contends that the breach of fiduciary duty claims and constructive fraud claims must be dismissed as being duplicative of the breach of contract claims, since all of those claims are based on the same fiduciary duty arising under the contract. The applicable legal principles on this point appear clear:

> Under New York law, a tort cause of action generally does not lie where it is duplicative of a claim sounding in contract. However, an actionable tort may exist when the plaintiff asserts that the defendant breached a duty independent of the contract. The duty can be considered independent of the contract even if it arises out of the relationship that the contract created. This legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract. Therefore, in a case where the plaintiff sufficiently pleads a duty beyond the scope of a contract, he can also maintain other tort claims.

*Consolidated Risk Servs., Inc. v. Automobile Dealers WC Self Ins. Trust*, No. 1:06-CV-871 (FJS/RFT), 2007 WL 951565 at *2 (N.D.N.Y. Mar. 27, 2007) (citations and internal quotation marks omitted). Specifically with regard to claims for breach of fiduciary duty,

> [p]leading a breach of fiduciary duty is appropriate where a plaintiff, even if claiming a breach of contract, desires a remedy in tort for betrayal and breach of trust ( *Zimmer-Masiello, Inc. v. Zimmer, Inc.*, 159 A.D.2d 363, 367, 552 N.Y.S.2d 935 [1st Dept.1990] ). Where a fiduciary duty may be found, this claim is generally not fatally duplicative of a breach of contract claim ( *Davis v. Dime Savings Bank of New York, FSB*, 158 A.D.2d 50, 557 N.Y.S.2d 775 [3rd Dept.1990], bank's obligation to pay taxes).

*Broadway Nat. Bank v. Barton-Russell Corp.*, 154 Misc.2d 181, 198, 585 N.Y.S.2d 933,

945 (N.Y. Sup. 1992). However, a plaintiff cannot pursue a separate breach of fiduciary duty claim based on allegations of fiduciary wrongdoing that "are either expressly raised in plaintiff's breach of contract claim or encompassed within the contractual relationship by the requirement implicit in all contracts of fair dealings and good faith." *Brooks v. Key Trust Co. Nat'l Assoc.*, 26 A.D.3d 628, 630, 809 N.Y.S.2d 270 (3d Dept. 2006) (citation omitted). That is, a plaintiff may not maintain both a contract claim and a breach of fiduciary duty claim, without "allegations that, apart from the terms of the contract, the parties created a relationship of higher trust than would arise from their contracts alone, so as to permit a cause of action for breach of a fiduciary duty independent of the contractual duties." *Id.* (citation and internal quotation marks omitted).

In the instant case, James maintains that Defendant had fiduciary duties independent of the parties' contract. (Williams Declaration [#45] at 10) ("[T]he contract between Jimmy and Ayco clearly gave rise to a fiduciary obligation on Ayco's part which exceeded the mere performance of its obligations under the contract.") (*citing SEC v. Capital Gains Research Bureau*, 375 U.S. 180, 194, 84 S.Ct. 275, 284 (1963) for the proposition that "[c]ourts have imposed on a fiduciary an affirmative duty of utmost good faith, and full and fair disclosure of all material facts, as well as an affirmative obligation 'to employ reasonable care to avoid misleading his clients.") (footnotes and internal quotation marks omitted). Specifically, James states that Defendant "breached this fiduciary duty of full disclosure by failing to advise him that Konya was not qualified to provide investment

advice and that Konya was giving him improper investment advice." *Id*.[11]  Mrs. Balta and Julia, by contrast, admit that "[t]he fiduciary duties alleged to have been breached arose, expressly or impliedly, from the contractual relationship between Ayco and the Baltas." (Mrs. Balta's and Julia's Memo of Law [#66] at 9).

Considering all of the foregoing, the Court finds that the breach of fiduciary duty claims are duplicative of the contract claims.  Any fiduciary duties allegedly breached by Defendant arose, expressly or impliedly, under the contract, and the parties had no relationship of trust apart from their contractual relationship.  Whether viewed as a failure to act prudently or a failure to disclose information, the alleged breach of fiduciary duty boils down to Defendant's failure to provide good investment advice, which was its primary obligation under the contract.  Accordingly, Defendant is entitled to summary judgment on the fiduciary duty claims.  For the same reasons, Plaintiffs' constructive fraud claims are duplicative of the breach of contract claims, since they are based on the alleged breach of the same fiduciary duties, which arose, expressly or impliedly, from the parties' contract. *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 183 (2d Cir. 2007) ("[U]nder New York law, parallel fraud and contract claims may be brought if [inter alia,] the plaintiff . . . demonstrates a legal duty separate from the duty to perform under the contract[.]").   Consequently, Defendant is entitled to summary judgment on the constructive fraud claims.

The aiding and abetting claim, however, is based on James's alleged breach of

---

[11]At the same time, James maintains that all of Plaintiffs' losses arose from Defendant's breach of the parties' contract: "All of the losses sustained by the Baltas were incurred by Plaintiffs because Defendant and Konya failed to render the financial advice and services that Ayco contracted to render." *Id*. at 1.

fiduciary duties to his mother and sister, and not on Defendant's alleged breach of fiduciary duties. Therefore, the aiding and abetting claim is not duplicative of the breach of contract claims. Accordingly, the aiding and abetting claim may go forward.

### *Proximate Causation Concerning the AT&T and Worldcom Stock*

Defendant maintains that it is entitled to partial summary judgment on Plaintiffs' claims for damages concerning the AT&T and Worldcom stock, since it did not proximately cause any damages with regard to such stock. Specifically, with regard to the AT&T stock, Defendant maintains that McMahon advised James to diversify prior to the drop in the stock's value, and that James ignored the advice and purchased more AT&T stock. James's decision to ignore McMahon's advice, Defendant contends, broke any chain of causation that existed. Similarly, with regard to the Worldcom stock, Defendant maintains that it never advised James to buy the stock, and that James bought most of the stock long after Konya had left Defendant's employ.

In response, Mrs. Balta and Julia addressed Defendant's causation argument only with regard to their aiding and abetting claim. (Mrs. Balta's and Julia's Memo of Law [#66] at 12-16). As for the issue of causation with regard to that claim, Mrs. Balta and Julia argue that Defendant's failure to notify them of James's fiduciary misconduct (failure to diversify) is the proximate cause of their injuries, and that such chain of causation cannot be broken, unless Defendant can demonstrate that they had actual knowledge of James's misconduct. *Id*. at 12-13. Mrs. Balta and Julia further maintain that James's knowledge cannot be imputed to them, since Defendant had reason to know that James was not keeping them informed of his investment activities.

As for James, he did not expressly address Defendant's causation arguments, but

instead, adopted Mrs. Balta's and Julia's legal arguments. (Williams Declaration [#45] at 2). Nevertheless, the Court reads James' submissions as arguing that Defendant proximately caused Plaintiffs' losses, with regard to the AT&T and Worldcom stock, by failing to properly advise Plaintiffs of the need to diversify. In that regard, James cites the testimony of Porten, Plaintiffs' expert, who stated that although McMahon observed that there were problems with Plaintiffs' accounts, he failed to properly advise Plaintiffs regarding the need for diversification, and failed to recommend other strategies to reduce Plaintiffs' risk. In that regard, Porten stated that McMahon did not properly advise James, a young, unsophisticated investor, who was acting "imprudently" and breaching fiduciary duties to his mother and sister, with regard to both the AT&T and Worldcom stock, by "maintaining concentrated positions and not allocating the assets in a prudent structure." (Porten Deposition at 211; *see also, Id*. at 212).[12]

Based on the entire record, the Court finds that there are triable issues of fact as to whether Defendant proximately caused any of Plaintiffs' losses as to the AT&T and Worldcom stock. For example, there are issues of fact as to whether McMahon's advice to James, concerning the AT&T and Worldcom stock, was adequate. Accordingly, Defendant's application for partial summary judgment as to the AT&T and Worldcom stock is denied.

---

[12]In that regard, Defendant was aware of James's trading activities, from talking with him and from receiving monthly statements and trade confirmations from Plaintiffs' SSB accounts. In fact, McMahon admitted that he was so concerned about James's trading decisions that he sought out a more senior account manager for advice on how to handle the situation. (McMahon Dep. at 282-284)("I was concerned that Jim was not following my advice. I was concerned that he was not investing consistent with our asset allocation model. I had worked with Scott for a number of years. He was a Senior Account Manager. I went to him for his advice. I wanted to get his advice on how I should address the situation; how can I make Jim – how can I get across to Jim what needs to be done to get him out of this situation.").

Defendant contends that no contract was formed prior to July 28, 2000, since the parties had indicated their intent not to be bound until a written agreement was signed. Plaintiffs, on the other hand, maintain that McMahon's letter dated June 21, 1999, was an offer, and that James's telephone call to McMahon, agreeing to the nine-thousand-dollar fee, was an acceptance, even though "there is no question that both parties contemplated the execution of a formal written document subsequent to [James's] oral acceptance." (Mrs. Balta's and Julia's Memo of Law [#66] at 17-18). Plaintiffs emphasize that Defendant billed Plaintiffs for services beginning July 1, 1999, which "belies [Defendant's] assertion that the [Plaintiffs] were not 'clients' until late July." *Id*. at 18, n. 13. Plaintiffs further contend that upon application of the relevant legal principles, there are issues of fact that preclude summary judgment. *Id*. at 18.

The law on this point is well settled:

> Under New York law, if parties do not intend to be bound by an agreement until it is in writing and signed, then there is no contract until that event occurs. This rule holds even if the parties have orally agreed upon all the terms of the proposed contract. On the other hand, where there is no understanding that an agreement should not be binding until reduced to writing and formally executed, and where all the substantial terms of a contract have been agreed on, and there is nothing left for future settlement, then an informal agreement can be binding even though the parties contemplate memorializing their contract in a formal document. The point of these rules is to give parties the power to contract as they please, so that they may, if they like, bind themselves orally or by informal letters, or that they may maintain 'complete immunity from all obligation' until a written agreement is executed. What matters are the parties' expressed intentions, the words and deeds which constitute objective signs in a given set of circumstances.

*R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 74 (2d Cir. 1984) (citations omitted).

Expressed another way,

24

> [i]f the court can see from the writings or correspondence that the minds of the parties have met, that a proposal has been submitted by one party which has been accepted by the other, and that the terms of the contract have been in all respects definitely agreed upon, one of the parties cannot evade or escape from his obligation by refusing to sign the formal contract, which the parties understood was subsequently to be drawn and executed.

*Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 575 (2d Cir. 1993).

In considering whether parties intended to be bound only be a written agreement, courts look at a list of four factors, wherein "[n]o single factor is decisive, but each provides significant guidance." *Id*. at 75.    Specifically,

> [p]ursuant to New York law, the Court must balance four factors to determine whether a party communicated an intent to be bound only by a signed agreement: (a) whether the parties expressly reserved the right to be bound only be a signed writing; (b) whether either party has partially performed under the agreement; (c) whether the parties agreed on all the terms of the alleged contract, and (d) whether the type of contract involved is usually put in writing.  The first factor is the most important, and has in some cases found to be dispositive.

*Farago Adver., Inc. v. Hollinger Intern., Inc.*, 157 F.Supp.2d 252, 258-259 (S.D.N.Y. 2001) (citations and internal quotation marks omitted).

Here, the issue is whether the parties intended to be bound only by a written agreement, or whether they intended to form an oral contract that would later be memorialized in writing.  Having considered the factors set forth above in light of the entire record, the Court finds that, although there is considerable evidence that Defendant intended to be bound only by written agreement,  there are still triable issues of fact on this point.  Specifically, Defendant's invoice, purporting to bill Plaintiffs for services beginning on July 1, 1999, and Plaintiffs' payment of that invoice, is clearly inconsistent with Defendant's contention that the parties had no agreement until approximately one month later.   Therefore, Defendant's application for partial summary judgment, seeking a

determination that no contract existed between the date that James orally agreed to the nine-thousand-dollar fee and the date the written agreement was signed, is denied.

CONCLUSION

For the foregoing reasons, Defendant's motion for partial summary judgment [#54] is granted in part and denied in part as follows: The application is granted as to the breach of fiduciary duty claims, the aiding and abetting claims that are based on James Balta's imprudent investing, and the constructive fraud claims, and is otherwise denied.[13]

Dated:       Rochester, New York
            May 19, 2009

ENTER:


/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge

---

[13]The Court previously addressed one aspect of Ayco's motion, and granted summary judgment to Ayco on Plaintiffs' claims for punitive damages. (Docket No. [#76]). This Decision and Order addresses the remaining aspects of Ayco's motion.